IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

CHARLOTTE NEW                                                                                              PLAINTIFF

v.                           NO. 3:17-cv-00229 PSH

NANCY A. BERRYHILL, Acting Commissioner                DEFENDANT
of the Social Security Administration

## MEMORANDUM OPINION AND ORDER

Plaintiff Charlotte New ("New") began this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, she challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon the findings of an Administrative Law Judge ("ALJ").

New maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole.[1] New first maintains that her residual functional capacity was erroneously assessed, in part, because the ALJ improperly rejected the opinions of Dr. Rolland Hollis, M.D., ("Hollis"). New also alleges the following: "[t]he vocational expert failed to address whether the jobs he identified could be performed with a sit-stand option," and "[t]he ALJ[] failed to include any limitation … that accounts for New's borderline intellectual functioning," see Docket Entry 13 at CM/ECF 32.

---

[1]     The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

New filed her application for supplemental security income payments on August 20, 2014. At the beginning of the administrative hearing, she amended her onset date. The amended onset date was August 20, 2014, or the date she filed her application. The ALJ denied the application on April 8, 2016. The relevant period in this case is thus from August 20, 2014, through April 8, 2016. Evidence prior to August 20, 2014, will nevertheless be considered in order to place her impairments in an historical context.

New has ably summarized the evidence in the record, and the Commissioner has not challenged the summary. It will not be reproduced, except to note several matters germane to the issues raised in the parties' briefs.

The record reflects that prior to August 20, 2014, New sought medical care for chronic obstructive pulmonary disease ("COPD") and acute bronchitis. See Transcript at 655-657 (12/05/2013), 647-648 (02/07/2014), 506-517 (02/12/2014), 444-505 (02/15/2014), 421-443 (02/25/2014), 407-420 (03/04/2014), 645-647 (03/07/2014), 394-406 (03/13/2014), 375-387 (04/22/2014), 363-374 (05/26/2014), 636-637 (08/16/2014), 337-360 (08/17/2014).[2] She reported difficulties breathing, shortness of breath, coughing, and wheezing. A February 12, 2014, chest x-ray showed haziness in her left lung. See Transcript at 510. A May 26, 2014, chest x-ray, though, showed that her chest was "stable." See Transcript at 369. She received supplemental oxygen and breathing treatments for her symptoms and was prescribed treatment that included a Pro-Air inhaler.

---

[2] New rarely sought medical attention for just one impairment during the typical examination; instead, she usually sought medical attention for several impairments during a single examination. There are other instances in which she sought medical attention for her symptoms associated with COPD and/or acute bronchitis. The Court has identified these dates because they appear to be when she primarily complained of symptoms associated with COPD and/or acute bronchitis. The Court will do likewise with her other impairments, i.e., the Court will only note the dates when the impairment appeared to have been the primary complaint.

2

New sought medical care for chest pain and/or heart-related issues prior to August 20, 2014. See Transcript at 326-327, 568-569 (11/04/2013); 518-542 (01/26/2014). She presented to an emergency room on November 4, 2013, complaining of chest pain and angina. Following testing, she underwent a percutaneous coronary intervention.[3] Upon her discharge, she was diagnosed with, inter alia, coronary artery disease secondary to atherosclerotis heart disease and prescribed medication. She presented to an emergency room on January 26, 2014, complaining of exertional chest pain. An EKG showed normal sinus rhythm, and a troponin test was negative. A stress echocardiogram was negative for myocardial ischemia and low probability for coronary artery disease. She was diagnosed with, inter alia, coronary artery disease secondary to atherosclerotis heart disease and continued on her medication.

New sought medical care for back and joint pain prior to August 20, 2014. See Transcript at 664-665 (09/24/2013), 662-663 (10/02/2013), 654-655 (12/11/2013), 642-644 (05/05/2014), 638-640 (06/30/2014), 637-638 (07/09/2014), 331-335 (08/07/2014). Tenderness was noted in her back, and she had a reduced range of motion in her leg joints. She was prescribed medications that included Gabapentin.

New also sought medical care for depression and anxiety prior to August 20, 2014. See Transcript at 661-662 (10/28/2013), 652-654 (12/20/2013), 650-652 (01/09/2014), 649-650 (01/17/2014), 640-641 (06/12/2014). She reported that she oftentimes felt on edge, feared losing control, and had difficulty sleeping. She was prescribed medication that included Xanax.

---

[3] New also sought medical attention for pain and bruising in her leg, thigh, and groin near where a stent was placed. See Transcript at 659-661 (11/08/2013), 543-551 (11/09/2013), 657-659 (11/23/2013). Groin and limb pain status post to stent placement was diagnosed, and she was prescribed medication for her pain.

3

The record reflects that after August 20, 2014, New continued to seek medical care for COPD and acute bronchitis. See Transcript at 634-636 (08/29/2014), 741-750 (09/17/2014), 727-740 (09/21/2014), 632-634 (10/03/2014), 702-714 (11/16/2014), 672-701 (12/02/2014), 846-857 (03/07/2015), 817-831 (06/15/2015), 859-895 (09/05/2015). She continued to report difficulties breathing and shortness of breath. She reported on at least one occasion that her difficulties breathing were not relieved with the use of supplemental oxygen or breathing treatments. Chest x-rays, though, showed nothing acute and were unremarkable for any significant abnormality. A pulmonary function study was performed on October 22, 2014, and it produced unremarkable results. See Transcript at 617-623. She was continued on supplemental oxygen and breathing treatments and prescribed medications.

Beginning on October 30, 2014, and continuing through September 16, 2015, New saw Hollis on what appears to have been eight occasions for several complaints. See Transcript at 761 (10/30/2014), 760 (11/26/2014), 759 (12/22/2014), 757-758 (01/26/2015), 767 (03/17/2015), 766 (04/21/2015), 765 (06/22/2015), 905 (09/16/2015). His progress notes reflects that during the period, her blood pressure was oftentimes elevated, she experienced shortness of breath and coughing, and she suffered bouts of anxiety. An x-ray during the period revealed moderate degenerative changes in her right knee joint and minimal osteoarthritis in her left knee joint. He repeatedly diagnosed hypertension; arteriosclerotic heart disease ("ASHD"), status post stent; COPD; congestive heart failure; osteoarthritis of the knees; depression; and a generalized anxiety disorder. He prescribed medication, injections of Depomedrol, continued use of inhalers, and encouraged her to stop smoking.

After August 20, 2014, New continued to seek medical care for pain in her back, chest, abdomen, legs, and knees. See Transcript at 716-717 (11/11/2014); 846-857 (03/07/2015); 832-845 (05/05/2015); 769-777 (05/10/2015); 780-810 (07/13/2015); 896-903 (08/14/2015); 911-913 (12/11/2015); 46, 48-49 (06/27/2016, or outside the relevant period). Medical testing on November 11, 2014, showed degenerative disc space narrowing and osteophytosis of the lumbar spine at L2-L3 and L3-L4. EKGs and chest x-rays were unremarkable, as was an x-ray of her knee. On June 27, 2016, a MRI of her lumbar spine showed scoliosis with mild degenerative changes in her lumbar spine, and a CT scan of her chest showed evidence of possible inflammation and nodules. She was diagnosed with impairments that included chronic low back pain and neuropathic pain.

New sought medical care specifically for depression and anxiety on what appears to have been one occasion after August 20, 2014, see Transcript at 596-608 (02/02/2014), although she complained of depressive symptoms during examinations that were primarily for other impairments. Her symptoms appear to have been brought on by the deaths of people close to her. She reported, inter alia, a sad mood, loss of interest, decreased appetite, insomnia, restlessness and agitation, difficulties concentrating, and panic attacks. A depressive disorder and anxiety were diagnosed. Individual therapy was recommended.

On July 12, 2016, or outside the relevant period, New underwent an intellectual assessment performed by Amy Flaherty, LPE-I ("Flaherty"). See Transcript at 40-42. Testing showed that New had, inter alia, a full scale IQ score of seventy-one. Flaherty's conclusions were as follows:

5

> Results are not consistent with a diagnosis of Intellectual Disability. It seems that [New's] physical and mental health problems have likely taken a toll on her cognitive ability, although it is not severe enough at this time to warrant an intellectual disability diagnosis.
>
> Is the individual's education and developmental history consistent with a diagnosis of Intellectual Disability? NO.
>
> Are the deficits in adaptive functioning consistent with Intellectual Disability? NO.
>
> Are the IQ results considered valid and reliable? YES.

See Transcript at 41.

On January 18, 2016, Hollis completed a Medical Source Statement ("Statement") on behalf of New. See Transcript at 915-916. In the statement, he identified her impairments as hypertension, arteriosclerotic heart disease, COPD, and osteoarthritis in her knees. Hollis represented that New's work-related limitations include the following: New can lift and/or carry less than ten pounds; can stand and walk for less than two hours in a normal workday; can sit for about six hours in a normal workday; requires frequent, unscheduled breaks or rest periods during a normal workday; requires longer than normal breaks; must be allowed to shift from sitting to standing/walking; has a decreased ability to concentrate and would need to be redirected frequently; and must avoid all exposure to irritants such as fumes, odors, dust, gas, solvents, and chemicals. He opined that she would miss more than three days a month because of her impairments and the treatment for them.

New's medical records were reviewed by state agency medical professionals. See Transcript at 84-99, 100-118. They appear to have opined that she could perform light, unskilled work.

A series of documents were completed by New, or completed by others on her behalf, in connection with her application. See Transcript at 214-216, 217-227, 232-242, 245-251, 252-259, 260-267, 268-271, 274-279. In the documents, it was represented that she does little during the day. She represented that a typical day consists of seeing her children off to school, taking her medication, receiving updraft treatments, doing light housework, and caring for her children when they return home from school. She can attend to her own personal care, prepare meals, drive an automobile, and shop for groceries. Her hobbies include watching television, reading, and occasionally attending her son's sporting events. New can walk for between fifteen to thirty minutes before requiring rest, can sit for about an hour before she begins experiencing pain, sometimes finishes what she starts, can largely follow written and spoken instructions, but does not handle stress and changes in her routine well. She uses an inhaler during the day and uses supplemental oxygen at night.

The record contains evidence of New's work history. See Transcript at 205-206, 219, 252. The history reflects that she has worked as a cashier, cook, general manager of a restaurant, and caregiver. A summary of her FICA earnings between 1978 and 2013 reflects that she only occasionally had reportable earnings. See Transcript at 197.

New testified during the administrative hearing. See Transcript at 57-61, 62-76. She was fifty-one years old and living by herself. She attended high school through the ninth or tenth grade, can read and write, and is able to perform basic mathematics. She acknowledged that her work history is poor but attributed it to being unable to stand on her feet. She has been unable to obtain her GED because she cannot concentrate for any significant length of time. New uses supplemental oxygen as

needed and testified that it was not for sleep apnea but for COPD. She continues to smoke cigarettes and, in fact, smoked two packs a day for approximately one year after she began using supplemental oxygen. She testified, though, that she is attempting to reduce her tobacco use. She can stand for about twenty minutes at a time and can sit for about thirty minutes at a time. She has received mental health treatment in the past but was not receiving treatment at the time of the hearing.

A vocational expert testified during the administrative hearing. See Transcript at 61, 77-79. The ALJ asked the vocational expert whether there were work for a hypothetical individual with New's limitations, limitations that included the ability to, inter alia, walk for six to eight hours, sit for six to eight hours, "one to two hours without interruptions." See Transcript at 77. The vocational expert testified that the hypothetical individual could perform work as a cashier, small product assembler, and assembly machine tender.

The ALJ found at step two of the sequential evaluation process that New has severe impairments in the form of COPD, coronary artery disease, spinal strain of the lumbar spine, an affective disorder, an anxiety disorder, and obesity. He assessed her residual functional capacity and found that she can perform light work albeit with the following limitations:

> … due to her mild to moderate pain, she could occasionally climb, stoop, crouch, kneel, and crawl. She could lift and carry 20 pounds occasionally and 10 pounds frequently. She could sit 6-8 hours and stand/walk 6-8 hours for 1 to 2 hours without interruption. She could perform unskilled/rote activity. She could understand, follow, and remember concrete instructions. She could have superficial contact with supervisors, co-workers, and the public. For example, she could meet, greet, make change, and give simple instructions and directions.

8

See Transcript at 16. In making the assessment, the ALJ assigned little weight to Hollis' opinions contained in the Statement. The ALJ did so for the following reasons:

> ... First, Dr. Hollis' medical source statement is not accompanied by any substantive explanation for the basis for his opinion. Further, his opinion is inconsistent with the overall record, which shows fairly minimal findings on diagnostic and clinical testing. For example, the record shows [New's] FVC [i.e., forced vital capacity] was 80% and FEV1 [i.e., forced expiratory volume-one second] was 90% ... On examination, [she] generally exhibits normal respiratory rhythm and rate, clear breath sounds, no wheezing, no rales or rhonchi, and her lungs are clear to auscultation ... Lastly, the records shows that [she] smokes two packs of cigarettes a day, which tend to suggest that her COPD and heart impairment do not cause limitations as severe as those opined by Dr. Hollis ...

See Transcript at 20. The ALJ found at step four that New cannot perform her past relevant work but found at step five there is other work she can perform.

New maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole. New so maintains first because the ALJ rejected Hollis' opinions contained in his Statement.

The ALJ must assess the claimant's residual functional capacity, which is a determination of the most she can do despite her limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). It is made using all of the relevant evidence in the record and must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). As a part of the assessment, the ALJ must consider the medical opinions in the record. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007). A treating physician's medical opinions are given controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence. See Choate v. Barnhart, 457 F.3d 865 (8th Cir. 2006).

9

The first reason the ALJ gave for discounting the opinions contained in Hollis' Statement, i.e., the Statement is not accompanied by an explanation for Hollis' opinions, is not compelling. Although Hollis offered very little support in the Statement for his opinions, the Statement is but one part of a larger record. The Statement should therefore be read in light of that record. The third reason the ALJ gave, i.e., New smokes two packs of cigarettes a day, was undoubtedly true at one time, but it appears that New is attempting to cut back on her use of tobacco. See Transcript at 65-66. The ALJ can consider a claimant's use of tobacco products in assessing the work-related limitations caused by her restrictions, but it is imperative that the amount and frequency of the claimant's use of tobacco be fairly characterized. The second reason the ALJ gave, though, i.e., Hollis' opinions are inconsistent with the record as a whole, is supported by substantial evidence on the record as a whole, and the ALJ could discount Hollis' opinions for that reason. The Court so finds for two reasons.

First, Hollis' opinions in the Statement are inconsistent with his own progress notes. Hollis saw New on what appears to have been eight occasions between October 30, 2014, and September 16, 2015, and his progress notes contain minimal findings. Save finding that her blood pressure was oftentimes elevated, she experienced shortness of breath and coughing, and she suffered bouts of anxiety, his notes contain little or otherwise unremarkable findings. It is true he repeatedly diagnosed several impairments and prescribed treatment that included medications, injections of Depomedrol, and continued use of inhalers. It is not clear, though, what evidence caused him to make those diagnoses. It is also not clear how he could have offered the opinions he did based on such minimal findings.

Second, Hollis' opinions in the Statement are inconsistent with the record as a whole. A January 26, 2014, EKG showed normal sinus rhythm, and a troponin test was negative. A stress echocardiogram was negative for myocardial ischemia and low probability for coronary artery disease. Chest x-rays throughout the relevant period showed nothing acute. A pulmonary function study was performed on October 22, 2014, and it produced unremarkable results. Medical testing on November 11, 2014, did, though, show degenerative disc space narrowing and osteophytosis of the lumbar spine at L2-L3 and L3-L4. On December 12, 2015, New sought emergency room care while in Nashville, Tennessee. Although her lumbar spine was tender to palpation, her motor strength was 5/5 in her extremities, she had a normal gait, and she was able to "heel walk and toe walk." See Transcript at 912. A June 27, 2016, MRI of her lumbar spine confirmed the results of the earlier testing, specifically, the MRI showed scoliosis with mild degenerative changes in her lumbar spine. An x-ray revealed moderate degenerative changes in her right knee joint and minimal osteoarthritis in her left knee joint. A CT scan of her chest showed evidence of possible inflammation and nodules. In short, the evidence relevant to her physical impairments is unremarkable.

The evidence relevant to New's mental impairments is also unremarkable. She sought mental health treatment on only a few occasions and admitted during the administrative hearing that she was not then seeking such treatment. On the occasions she did seek mental health treatment, the treatment was not particularly rigorous. There also appears to have been a situational component to her depressive symptoms and anxiety. She reported that her mood was adversely affected by the deaths of people close to her and the stress of having her daughter live with her.

The non-medical evidence relevant to New's impairments is not particularly compelling. She can attend to her own personal care, prepare meals, drive an automobile, and shop for groceries. Her hobbies include watching television, reading, and occasionally attending her son's sporting events. During a typical day, she does light housework and cares for her children before they leave for school and after they return. She can follow written and spoken instructions, although she sometimes has difficulty doing so. It is also worth observing, as the ALJ could and did, that New continues to use tobacco products despite suffering from COPD, acute bronchitis, chest pain and/or heart-related issues.

New offers other reasons why her residual functional capacity was erroneously assessed. She maintains that she requires updraft treatments during the day and a portable oxygen machine at night. It is New's first contention that the ALJ conceded New's COPD was a severe impairment but "failed to place any restrictions on her regarding her obvious need to avoid dust, fumes, or other pulmonary irritants" in the assessment and in the hypothetical question the ALJ posed to the vocational expert. See Docket Entry 13 at CM/ECF 30.

The Commissioner maintains, and the Court agrees, that the only evidence supporting New's assertion is found in Hollis' Statement. In it, Hollis represented that New must avoid all exposure to irritants. There is no other evidence to support Hollis' opinion; his own progress notes do not support the opinion. Because the ALJ could and did properly discount Hollis' opinions contained in the Statement, the ALJ did not err in failing to place restrictions on New regarding her need to avoid irritants and did not err in formulating the hypothetical question to the vocational expert.

New next maintains that the ALJ also failed to consider whether New's use of a nebulizer would "interfere with her ability to sustain employment." See Docket Entry 12 at CM/ECF 30. New maintains that the omission is not harmless error because two of the jobs identified by the vocational expert—small products assembler and assembly machine tender—are "shift-work jobs and likely would not accommodate unscheduled breaks for a breathing treatment." See Docket Entry 12 at CM/ECF 30.

There is no merit to New's assertion. It is undisputed that she sometimes uses a nebulizer during the day. The ALJ could and did question her need for one, though, given her continued use of tobacco products. In any event, she appears to use a nebulizer on only an as-need basis, and it is not clear how long she must allot to using it. In short, she has failed to show that her use of a nebulizer during the day would interfere with her ability to sustain employment.

New last maintains that the requirements of the cashier II job identified by the vocational expert exceed New's residual functional capacity. New represents that the job requires more than just making change, as the vocational expert testified, and the ALJ limited New to "[s]uperficial contact with the public and coworkers, [m]eet, greet, maintains, [and] give[] simple instructions and directions," see Transcript at 77.

There is no merit to New's assertion. Assuming without deciding that the requirements of the cashier II job exceed New's residual functional capacity, the vocational expert identified two other jobs, i.e., small products assembler and assembly machine tender. The requirements of those jobs do not exceed New's residual functional capacity.

13

New offers another reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. New maintains that the vocational expert failed to address whether the jobs he identified could be performed with a sit-stand option. New supports her assertion by citing to Social Security Ruling 83-12, which provides, in part, the following: "Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base."[4]

There is no merit to New's assertion. The ALJ found that New retains sufficient residual functional capacity to perform light, unskilled jobs. The ALJ consulted a vocational expert to determine whether there were any light, unskilled jobs allowing for a sit-stand option that someone with New's limitations could perform. See Transcript at 77-78. The vocational expert testified that there were such jobs. Although it is true that his testimony was not extensive, there is nothing to suggest that he did not take into account New's need to alternate positions when assessing the jobs she could perform. See Carlson v. Chater, 74 F.3d 869 (8th Cir.1996) (Social Security Ruling 83-12 satisfied when vocational expert takes into account claimant's need to alternate positions when assessing what jobs she can perform). See also Conyer v. Astrue, 2009 WL 2524553 (E.D.Ark. 2009) (Deere, M.J.); Armoster v. Astrue, 2008 WL 5424137 (E.D.Ark. 2008) (Miller, J.). Thus, the vocational expert's testimony supported the ALJ's finding that there are light, unskilled jobs New can perform.

---

[4] "A VS is a vocational specialist, a term which describes all vocational resource personnel, including vocational consultants, vocational evaluation workshops, and vocational experts." See Hollimon v. Astrue, 2010 WL 4919537, 4 (E.D. Ark. Nov. 9, 2010) (Deere, M.J.), report and recommendation adopted, 2010 WL 4922193 (E.D. Ark. Nov. 29, 2010) (Holmes, J.).

New offers another reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. New maintains that the ALJ's assessment of New's residual functional capacity did not take into account her borderline intellectual functioning. New supports her assertion by maintaining the following:

> New testified that she tried to get her GEC, but could not comprehend the class material. She had difficulty in school, repeated the first and seventh grades, and was placed in resource classes in reading, science, and social studies from junior high forward. She can read a newspaper, but cannot keep her mind on it [for long]. She has never read a book. ... New underwent an intellectual assessment in July 2016 performed by ... Flaherty ... WAIS-IV testing showed that New has a full scale IQ score of 71. All her scores, except the working memory, were in the borderline range of intellectual functioning. The examiner indicated that the scores were considered valid and reliable. ...

See Docket Entry 13 at CM/ECF 32.

There is no merit to New's assertion. The Appeals Council found, and the Court agrees, that Flaherty's intellectual assessment "does not relate to the period at issue." See Transcript at 2. To the extent the assessment relates to the period at issue, it is inconclusive. Although Flaherty found that New had, inter alia, a full scale IQ score of seventy-one, Flaherty opined that the test results were not consistent with a diagnosis of an intellectual disability. Moreover, Flaherty opined that New's deficits in adaptive functioning were not consistent with an intellectual disability. Flaherty observed that New's physical and mental health problems appear to have taken a toll on her cognitive ability. Clearly, New experienced difficulties in school and has difficulty remembering and/or concentrating. The ALJ accounted for those limitations in assessing New's residual functional capacity as the ALJ limited New to unskilled/rote work involving superficial contact with supervisors, co-workers, and the public.

The governing standard, i.e., substantial evidence on the record as a whole, allows for the possibility of drawing two inconsistent conclusions. See Culbertson v. Shalala, 30 F.3d 934 (8th Cir. 1994). The ALJ crafted an assessment of New's residual functional capacity that limited her to light, unskilled work, and New has not shown how the ALJ erred in doing so. In short, the ALJ could find as he did.

On the basis of the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings. New's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 23rd day of April, 2018.

_____
UNITED STATES MAGISTRATE JUDGE